**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ALEXIS PAVLATOS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:25-cv-1666 |
| | ) | |
| 905 WEST RANDOLPH LLC, | ) | |
| d/b/a GOOD NIGHT JOHN BOY, | ) | |
| and FORWARD HOSPITALITY | ) | |
| GROUP, LLC, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | Jury Trial Demanded |

## COMPLAINT AT LAW

Plaintiff, Alexis Pavlatos, proceeding *pro se*, complains against Defendants, 905 West Randolph LLC, d/b/a Good Night John Boy, and Forward Hospitality Group, LLC, for violations of: (1) Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"); (2) the Illinois Human Rights Act, 775 ILCS 5 *et seq.* ("IHRA"); (3) the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* ("FLSA"); (4) the Illinois Minimum Wage Law, 820 ILCS 105/1 *et seq.* ("IMWL"); (5) the Chicago Minimum Wage Ordinance, Municipal Code of Chicago, Chapter 6-105 *et seq.*, and (6) the Illinois Wage Payment and Collection Act, 820 ILCS 115/1 *et seq.* ("IWPCA"), and in support thereof, states:

## INTRODUCTION

1.      Plaintiff has been a licensed attorney since 2018 but has worked in the service industry at least part-time since 2013 to help ameliorate her student debt, including working for Defendants as a bartender for several months between summer 2023 and late spring 2024.

2.      Despite her more than a decade in the service industry, Plaintiff has never filed an administrative charge, lawsuit, or taken legal action of any kind against any of her former employers, for any reason. However, Defendants' egregious workplace misconduct—including sexual

1

harassment, discrimination, retaliation, and multiple wage violations—left her no choice but to pursue this action.

3.    Under the pretext of violating Defendants' "drinking policy," Plaintiff was wrongfully terminated in retaliation for opposing her bar manager's workplace harassment—<u>just one shift after she engaged in protected activity</u> by finally objecting to his months-long campaign of harassment.

4.    Specifically, <u>one shift prior to her termination</u>, her bar manager became intoxicated, threw ice at her head, and screamed in her face, all in front of guests. Plaintiff defended herself by demanding he stop yelling and throwing things at her.

5.    Just one (1) shift later, the bar manager fired Plaintiff for allegedly violating Defendants' drinking policy—a policy he personally disregarded and Defendants selectively enforced at their convenience.

6.    Following Plaintiff's termination, Defendants fabricated a disciplinary write-up to retroactively justify their actions, altering her personnel file in violation of Illinois law.

7.    Beyond Plaintiff's unlawful termination, Defendants engaged in numerous wage and hour violations, including but not limited to:

- Illegally including a manger in the tip pool, in violation of the FLSA;
- Failing to pay Plaintiff for all hours worked, in violation of the FLSA, IMWL, and Chicago Minimum Wage Ordinance;
- Unlawfully deducting 25% of Plaintiff's wages without notice or consent, in violation of the IWPCA; and
- Failing to reimburse Plaintiff for necessary uniform expenses, in violation of the IWPCA.

8.    Accordingly, Plaintiff asserts the following causes of action against her former employer.

## JURISDICTION & VENUE

9.      This Court has jurisdiction over this action pursuant to 42 U.S.C. § 2000e-5 (Title VII); 29 U.S.C. § 201 (FLSA); 28 U.S.C. § 1331 (federal question); and 28 U.S.C. § 1367 (supplemental jurisdiction).

10.     Venue is appropriate in this district pursuant to 42 U.S.C. § 2000e-5 (Title VII), 29 U.S.C. § 201 (FLSA), and 28 U.S.C. § 1391(b)(1), (2) (venue generally).

## PROCEDURAL REQUIREMENTS

11.     Plaintiff has complied with all administrative prerequisites by timely cross-filing a Charge of Discrimination with the Illinois Department of Human Rights ("IDHR") and the Equal Employment Opportunity Commissions ("EEOC").

12.     On November 20, 2024, the EEOC issued a Notice of Plaintiff's Right to Sue for Plaintiff's charges as set forth in ¶ 11, and as such, this is a timely filed Complaint.[1]

## PARTIES

13.     Plaintiff is a former employee of Defendants, 905 West Randolph LLC, d/b/a Good Night John Boy Chicago ("GNJB Chicago") and Forward Hospitality Group, LLC.

14.     Plaintiff is domiciled in and resides in Chicago, Illinois, within this judicial district.

15.     Defendant, GNJB Chicago, is an Illinois limited liability company that owns and operates a 70s-themed nightclub located at 905 W. Randolph Street, Chicago, IL 60607, within this judicial district.

16.     Defendant, Forward Hospitality Group, LLC, is a Delaware limited liability company that oversees several restaurant and bar concepts located nationwide, including GNJB Chicago.

---

[1] Plaintiff has requested and is waiting for an adoption of findings from the Illinois Department of Human Rights.

## STATEMENT OF FACTS

Plaintiff's Hire by Defendants

17.     Plaintiff was hired to work at GNJB Chicago as a bartender on May 17, 2023. The venue opened July 21, 2023.

18.     GNJB Chicago is owned in full or in part by Forward Hospitality Group, LLC. Forward Hospitality also owns FWD Flats LLC d/b/a FWD Day + Nightclub, located in Cleveland, Ohio. The FWD venue is similarly pronounced "Forward."

19.     Prior to her first shift, on July 5, 2023, Plaintiff digitally signed several onboarding documents sent by Defendants, including an employee manual titled "Forward Hospitality Group 2023 Training Manual" and "FWD Drinking Policy."

20.     The FWD Drinking Policy states that it applies to "FWD Flats LLC (and all venues associated with FWD)" and outlines the progressive discipline policy for both employees and managers regarding alcohol consumption at work.

21.     Per the FWD Drinking Policy, if an hourly employee, such as a bartender, is suspected of drinking while on shift, management is required to remove the employee from the floor, investigate the situation, and take disciplinary action only after a 24-hour "cool-off" period. The policy mandates a three-shift suspension and a final write-up for a first offense, and automatic termination for a second offense.

22.     Per the FWD Drinking Policy, if a manager, such as a bar manager, is suspected of drinking while on shift, the general manager is required to remove the manager from the floor, investigate, and involve the Director of Operations and HR before making a final decision after a 24-hour "cool off" period. The policy mandates a one-week unpaid suspension for a first offense, and automatic termination for a second offense.

23.     Despite the existence of this policy, Plaintiff's bar manager openly drank every shift, and on several occasions early on in her employment, she was offered shots by various members of management and ownership, which she declined.

24.     Plaintiff did not drink for over a year prior to her hire at GNJB Chicago, and only drinks socially and sparingly.

25.     At a staff meeting in or around spring 2024, the general manager and ownership announced they would be adopting a "no drinking" policy at work. The general manager expressly stated he would "lead by example;" yet, Plaintiff saw him drinking again at work within days of this announcement. Upon information and belief, the bar manager never stopped drinking at work.

26.     Plaintiff eventually drank a handful of times at GNJB Chicago, only after witnessing several other employees—including but not limited to, the general manager, bar manager, and every male bartender on staff—drinking openly, heavily, and regularly at work with no repercussions, thereby failing to apply the terms of the FWD Drinking Policy.

Defendants' Job Assignments and Management Practices Create a Hostile and Unequal Work Environment

27.     As a bartender, Plaintiff was responsible for taking guest orders, preparing beverages, processing payments, and setting up and breaking down the bar.

28.     In her role as a bartender, Plaintiff's direct supervisors were the general manager ("GM") and the bar manager ("BM").

29.     GM, who hired Plaintiff, was responsible for hiring, disciplining, and firing employees, managing payroll, and overseeing the day-to-day operations of the venue.

30.     BM, who ultimately fired Plaintiff, was also responsible for hiring and disciplining employees, as well as overseeing the day-to-day operations of the bar, managing the liquor order, training bartenders, planning and hosting staff meetings, creating the schedule, completing staffs'

"checkouts," which included, among other things, counting the cash drawers, collecting any credit card slips, and dismissing and clocking out the staff after their shift.

31.     BM assisted with bartending during peak hours, but the majority of his job duties were managerial.

32.     Accordingly, both GM and BM meet the definition of a supervisor as defined by Title VII, the IHRA, and the FLSA and its corresponding DOL regulations.

33.     For the first few months of her employment, BM typically scheduled Plaintiff on Friday and Saturday evenings and "high volume" holidays such as Halloween, New Year's Eve, and Saint Patrick's Day.

34.     GNJB has two bars: one upstairs and one downstairs. BM would assign bartenders to one of six (6) designated stations ("wells"). On a typical night, two (2) bartenders worked downstairs, while four (4) worked upstairs.

35.     Prior to each shift, bartenders' wells were preassigned by BM through the scheduling application, 7shifts.

36.     Plaintiff worked the overwhelming majority of her shifts at the upstairs bar. On Fridays, she was typically at Well 1, the northmost Well. On Saturdays, she was typically at Well 3, located between Well 2 and Well 4.

37.     For all shifts except for high volume holidays, BM scheduled a female at Well 3.

38.     Well 3 was located on an angle, and was an exceptionally narrow part of the bar, where two people could not pass behind one another without pressing up against the other person. Furthermore, it was a particularly high-traffic area of the bar. As a result, the employee staffed in Well 3 was oftentimes subjected to undesirable physical contact by staff passing behind them.

39.     When Plaintiff worked at Well 3, most male employees would appropriately pass behind Plaintiff with a touch on the shoulder or wait until she cleared the narrowest part of the bar

before attempting to pass. For example, she was never touched inappropriately by either of the two male bartenders who typically worked at Well 1 and Well 2 each Saturday.

40.     On the other hand, each shift BM worked, he assigned himself to Well 4, intentionally sandwiching himself in between the bottle servers' station and whichever female bartender he staffed at Well 3, so that he was consistently surrounded by women on both sides each shift.

41.     As BM would drink and his judgment would deplete, BM would oftentimes begin passing behind Plaintiff or the other females with a slap on the butt or use both hands to grab their waist. He did not pass behind male employees this way.

42.     In addition to being responsible for cleaning their assigned workstation, the employee assigned to Well 3 was also required to clean Well 4 each night while BM counted the cash drawers and ran the checkouts. This effectively meant that a female employee was consistently required to clean up after her male superior.

43.     BM routinely left Well 4 in a state of disarray, carelessly spilling liquids and garnishes all over the bar top, his bar mats, and in his liquor rails, littering the bar top with cans of mixer and the floors with mints he would spit out, as well as the garnishes, cans, cups, napkins, and straws that somehow failed to make it into the trash located within arm's reach to his left. As a result, cleaning Well 4 became one of the most undesirable and time-consuming tasks at the end of each night, and almost every night, it was done by a female.

44.     BM's well assignments were deliberate; given societal norms, he knew he could treat his female subordinates in ways that would not be tolerated by his male subordinates. Rather than adjust his behavior to be appropriate for the workplace, he surrounded himself with women to serve as emotional punching bags for his frustrations, which would gradually come out when intoxicated.

45.     As further detailed below, due to her proximity to Well 4 and BM's lack of self-control and respect for women that surfaced when drinking, Plaintiff frequently witnessed abusive conduct and, on several occasions, was on the receiving end of it.

<u>Defendants Reduce Plaintiff's Hours and Subject Plaintiff to Disparate and Harassing Treatment</u>

46.     Plaintiff's boyfriend at the time, like Plaintiff, also bartended part-time at GNJB while having a second, full-time job.

47.     Beginning in or around September 2023, Plaintiff and her boyfriend worked together on Fridays. She worked at Well 1 and her boyfriend worked at Well 2, while—per usual—another female bartender worked at Well 3 and BM worked at Well 4.

48.     By late fall, Plaintiff and her boyfriend began having disagreements over her interactions with male guests at work.

49.     After a handful of disagreements, Plaintiff expressed her concerns to BM that working with her boyfriend was becoming difficult as a result.

50.     In or around February 2024, in response to Plaintiff's concerns, BM's solution was to simply cut Plaintiff's scheduled shifts—and her paycheck—in half, removing her from her regular Friday shifts and limiting her to only one shift per week, on Saturdays.

51.     Meanwhile, BM allowed Plaintiff's boyfriend to retain both of his scheduled shifts on Thursdays and Fridays.

52.     BM attempted to justify this decision by citing Plaintiff's second job as the reason for the reduction. However, Plaintiff's boyfriend also maintained a second job and was not subjected to the same reduction in shifts.

53.     Like Plaintiff's boyfriend, BM complained to Plaintiff about her interactions with male guests, stating that female bartenders would take too long to take orders because male customers would attempt to talk to them too much.

8

54.     Because Well 4 was the slowest well, BM often had downtime between orders, which—when in a bad mood or when Plaintiff seemed unenthused with his conduct—he used to fixate on and scrutinize Plaintiff, as she worked just feet away at Well 3. He did not have a view of Well 1 or Well 2 from his vantage point, making Plaintiff the sole focus of his attention.

55.     For example, at times, he would police her drink recipes, accuse her of undercharging and/or overpouring, and clap obnoxiously to time her pours, all in the middle of service, all in front of guests. Plaintiff had already offered to pour test daily prior to her shift to ensure accuracy, but after being done a few times, this practice fell to the wayside.

56.     Moreover, BM would call and text Plaintiff if she stepped away from the bar to use the bathroom. Depending on his level of intoxication, it could be within the first minutes of her informing him she was going to the bathroom.

57.     BM would call or text Plaintiff when she would step off the floor to use the restroom, implying that BM believed Plaintiff to be slacking or avoiding work. Rather, the amount of bathrooms on the premises seemed insufficient to accommodate the amount of people in the building on any given night.

58.     To illustrate, there was a two-stall women's restroom upstairs, one private women's bathroom on the first floor, and two additional employee-only stalls all the way in the basement. The lines for the upstairs and first floor bathrooms tended to be extremely long, and upon information and belief, after Plaintiff's departure from the venue, the Fire Marshal issued GNJB Chicago a warning for overcapacity. Plaintiff felt uncomfortable cutting the line without female security's assistance as guests tended to already be irritated due to the egregious wait times. Plaintiff witnessed several fights at GNJB Chicago during her employment, including some that took place in the women's bathrooms. As a result, she did not feel comfortable further provoking intoxicated guests by explaining that she was an employee and had the right to cut the line simply to appease BM. Defendants did not

9

consistently staff female security, so oftentimes, Plaintiff had to walk through deep crowds and down two flights of steep stairs just to use the restroom. The employee-designated bathrooms downstairs were a significant distance from Plaintiff's station at the upstairs bar, and oftentimes were in conditions that made one stall unusable, causing Plaintiff to sometimes have to wait in line there, too.

59.     If she had her period and had to use the restroom multiple times in one night to change her sanitary products, she would be criticized for doing so, and then nitpicked as outlined in ¶ 55.

60.     On one occasion, within weeks of the criticism in ¶ 53, Plaintiff informed BM she was having "women's issues" to get him off her back, to which he laughingly replied, "this is why we don't hire women."

61.     Upon information and belief, BM did not call or text the male bartenders when they stepped away from the bar for cigarettes, bathroom breaks, or otherwise.

62.     Despite BM's concerns that Plaintiff was away from the bar for too long or spending too much time conversing with male guests, his concerns were unfounded, as she consistently had some of the highest sales and tip averages, which he would see every night while doing checkouts.

Defendants Enable a Hostile Work Environment

63.     Pursuant to Section 2-109 of the IHRA, all employers with one (1) or more employees are required to provide annual sexual harassment training within six (6) months of their hire.

64.     Sexual harassment is so prevalent in the service industry that the IHRA requires that every restaurant and bar, as defined under Section 2-110, to provide all employees with "supplemental" sexual harassment prevention training. This is in addition to the sexual harassment prevention training required of all employers under Sections 2-109.

65.     At no point during Plaintiff's employment did Defendants ever require its employees to complete any sexual harassment training.

10

66.     Further, sometime in the spring of 2024, Defendants fired their HR, providing no notice or alternate channel for employees to field their concerns.

67.     Plaintiff only learned of HR's termination from other employees after she reached out on April 30, 2024, and again on May 3, 2024, receiving no response.

68.     Defendants' failure to implement mandatory sexual harassment training, coupled with the abrupt termination of HR without providing employees an alternative reporting mechanism, contributed to an environment where misconduct flourished.

69.     As is set forth in greater detail below, from the time of Plaintiff's hire until her retaliatory termination, Defendants, primarily, though not exclusively through BM, subjected Plaintiff to pervasive harassment based on her sex, constituting a hostile work environment in violation of Title VII and the IHRA.

70.     When he was somewhat sober, Plaintiff got along with BM. On occasion, BM would even call Plaintiff on the phone in the early hours of the morning to recap after shifts.

71.     However, Plaintiff's Saturday shifts at Well 3 generally followed a similar pattern: BM would make small talk and then leave to smoke a cigarette. Upon his return, he would stand at his POS system, spray himself down with copious amounts of body spray, ingest several breath mints and pills—upon information and belief, Adderall—and then head to Well 4 to top off his cup with Jameson Irish whiskey and soda.

72.     As the night would progress and the venue would get busier, BM would continue drinking, and as his Adderall took effect and he grew more intoxicated, he would become increasingly irritated and aggressive.

73.     Those closest in proximity to Well 4—the bottle servers, the employee staffed at Well 3, and sometimes even the guests—became the target of BM's frustrations.

11

74.   BM's hostile conduct took many forms, including but in no way limited to the following:

- Calling female coworkers names, such as "stupid/dumb" "b*tches" and "c*nts" for minor perceived indiscretions. For example, on December 16, 2023, when BM was particularly drunk, BM referred to another female bartender by the aforementioned terms because her POS handheld—which *he* was responsible for charging—ran out of battery during peak service. Later that same night, when a host asked for a round of shots for her friends, he referred to her by the same derogatory terms. When Plaintiff told him to stop, he became aggressive and began nitpicking and micromanaging her, as illustrated in ¶ 55, loudly yelling across the server station, accusing her of overpouring and undercharging in front of guests. In this instance and in several others, his tirades were so outrageous that guests would make comments and express that they pitied her for his humiliating treatment of her. On this evening, prior to leaving for the night, Plaintiff complained to GM about BM's behavior after he made her cry during closing.

- Yelling, oftentimes with curse words, while giving basic instructions, and continuing to berate them even after they complied with what he said. For example, if Plaintiff had to pass behind him and he accidentally bumped into her, he would scream to "get out of my f*cking well", and would continue to yell even after she had left his proximity. Because he intentionally scheduled himself at Well 4, in between the all-female bottle server team's station and whichever female bartender was staffed in Well 3, the female staff would get the brunt of his abuse. On multiple occasions, she saw him make a specific bottle server cry.

- Smacking female employees on the butt or grabbing them by the waist with both hands to move past them. In fact, as early as September 2023, a female employee complained to Plaintiff via text about being "literally grope[d]" by BM at work, and that he "literally slapped [her] ass."

- Throwing ice or garnishes at Plaintiff to get her attention;

- Making derogatory comments about women's appearances, including comments about their weight, haircuts, and outfits, including guests, Plaintiff, and other employees.

75.   The conduct described above was persistent throughout the course of Plaintiff's employment with Defendants.

<u>Plaintiff Defends Herself and is Promptly Terminated</u>

76.   BM's misconduct came to a head in late spring of 2024.

12

77.     Two shifts prior to her final shift, on May 18, 2024, once again intoxicated, BM intentionally smacked Plaintiff on the backside while she was standing near her well during a lull. Plaintiff snapped her head around to give him a confused look and BM immediately apologized, seeming genuinely confused and expressing that he did not know why he did that. Plaintiff brushed off the incident as an intrusive thought and lapse in judgment.

78.     The shift prior to her final shift, on May 25, 2024, Plaintiff was texting on her phone during another lull in service. Rather than simply tell her to put away her phone, BM overhand-threw ice at her head, hitting her, while screaming across the service station in front of guests for her to get off her phone. Plaintiff immediately put her phone back in her backpack, then turned around and said back, "do not throw sh*t at me." BM proceeded to advance towards her, screaming as close as he could get to her face to "get off her f*cking phone." Plaintiff had already put her phone away, and yelled back that she understood, it was put away, and that regardless, he cannot touch or throw things at her, especially in front of guests. BM continued to yell back in response. GM witnessed BM yelling at Plaintiff and intervened. Plaintiff and BM ultimately returned to work without speaking unless necessary until the lights were on.

79.     Plaintiff was at a wedding the following weekend of June 1, 2024, and returned to work on June 8, 2024.

80.     For Plaintiff's final shift, just one (1) shift after she yelled at BM for whipping ice at her head, June 8, 2024, Plaintiff was assigned to Well 3 and BM to Well 4. Approximately two (2) hours after Plaintiff arrived, BM offered her a shot of Jameson, which she accepted. In the last two (2) hours of Plaintiff's shift, Plaintiff's boyfriend came into the venue. Plaintiff, her boyfriend, and other bartenders shared a couple of additional shots throughout the night. Once the music was off, the lights were on, and the guests were filtering out, Plaintiff continued chatting with her boyfriend while she cleaned her and BM's wells. Seemingly annoyed that they were talking, BM told Plaintiff to

13

get her things and leave. Plaintiff did not argue and grabbed her things and took a cab home with her boyfriend.

81.     On June 14, 2024, Plaintiff received a midday call from BM, who stated that "'the boys' talked and decided we have to let you go," terminating her employment for allegedly violating the drinking policy on June 8, 2024. Ironically, this decision came after enduring months of inappropriate behavior from BM, stemming from his own drinking and Adderall abuse.

82.     Despite purporting to have fired Plaintiff for violating the drinking policy, upon information and belief, all similarly situated male bartenders regularly—and oftentimes more egregiously—violated the drinking policy, oftentimes without repercussion, including the following incidents:

- On New Year's Eve, one male bartender was very intoxicated. When the lights were up and the guests exited the venue, he did not assist with closing duties to the same extent as Plaintiff and other staff members, and instead, spent closing time taking and pouring shots from an ice sculpture while Plaintiff and her boyfriend—both completely sober—cleaned the bar by themselves. On Saint Patrick's Day, the same male bartender took tallies of his shots on his hand/arm with a black marker. This practice was observed by BM as well as GM, who upon information and belief, was himself sent home by ownership for being too hungover after drinking at work the night before. By the end of the shift, the bartender boasted that he had consumed 36 shots. He was promoted to a management position within Defendants' company shortly after.

- Also on Saint Patrick's Day, another male bartender was so intoxicated that he was "blacked out" before noon. Around the same time period, the same male bartender was so intoxicated that he left the bar and attempted to physically lift female guests on the dance floor who in no way consented to such behavior and were visibly trying to get him away from them. This incident was recorded by another staff member. He was not terminated after either incident, and upon information and belief, he remains employed.

83.     Moreover, Plaintiff never received a write-up for any reason during her employment.

84.     For this reason, when Plaintiff received Defendants' Position Statement filed in response to Plaintiff's EEOC/IDHR Charge of Discrimination, she was shocked to see an unsigned write-up dated May 4, 2024, used as an exhibit.

14

85.     According to the unsigned, May 4, 2024, write-up:

It became apparent to management staff that Alexis Pavlatos was heavily intoxicated by the middle of her 8pm to close shift at Club Bar at Good Night John Boy West Loop (905 W. Randolph St. LLC). This action will result in Alexis being sent home early as well as a one week suspension.

86.     There are several problems: First, Plaintiff did not drink at work on May 4, 2024, as her family is Orthodox, it was the night before Greek Easter, and she had to be at her parents' house in the morning.

87.     Second, Plaintiff did not leave work early on May 4, 2024, for any reason. She left together with her boyfriend after they finished their shift at the usual time.

88.     Lastly, Plaintiff did not receive a one-week suspension—she was absent the following week, May 9, 2024–May 12, 2024, because she had requested off for a Bachelorette in Charleston, North Carolina, months in advance, not because she was reprimanded in any way.

89.     Upon information and belief, after Plaintiff engaged in protected activity by filing her Charge of Discrimination, GM retaliated against her further by fabricating a write-up to fit Defendants' narrative, and added it to her file after the fact in an attempt to justify her termination.

90.     Accordingly, Plaintiff requested her personnel file pursuant to the Personnel Records Review Act, 820 ILCS 40/1 *et seq.*, and timely received her personnel file from Defendants' counsel.

91.     Suspiciously, in the dozens of documents included in Plaintiff's personnel file, the May 4, 2024, write-up is the only one with its metadata erased.

92.     This matter is currently being investigated by the Department of Labor.

Defendants Improperly Included the Bar Manager in the Tip Pool

93.     In addition to the workplace hostility, discrimination, and retaliation Plaintiff experienced, Defendants also engaged in several unlawful wage violations, including improperly including management in the tip pool in violation of the FLSA.

94.     Bartenders from both the upstairs and downstairs bars participated in a shared tip pool, regardless of individual sales or contributions, and the pooled tips were then divided based on the number of hours worked.

95.     The FLSA explicitly prohibits employers, managers, and supervisors from retaining any portion of employee tips, including in a tip pool. 29 U.S.C. § 203(m)(2)(B).

96.     The FLSA applies the Department of Labor's executive exemption test to determine whether an employee qualifies as a manager or supervisor under the FLSA.

97.     To meet this exemption, an employee generally must:

- Have a primary duty of management, which includes hiring, firing, training, setting schedules, and overseeing compliance;
- Regularly supervise at least two (2) or more full-time employees or the part-time equivalent;
- Have the authority to hire or fire employees, or their recommendations must carry significant weight in employment decisions; and
- Be paid on a salary basis of at least $684 per week.

    29 C.F.R. § 541.100.

98.     For tip pooling purposes, an employee does not need to be salaried to be considered a manager or supervisor—only that their primary duty is management. 29 U.S.C. § 203(m)(2)(B)).

99.     Accordingly, and as outlined in ¶ 30, BM qualified as manager/supervisor under the FLSA, and by being included in the tip pool, Defendants violated the FLSA.

100.     Moreover, this violation was willful.

101.     At a bartender meeting in or around spring 2024, BM announced a new policy requiring both a form of payment and identification for all tabs. During this meeting, he also threatened that moving forward, employees would be required to cover any unpaid tabs due to declined cards or walkouts, emphasizing that he would *personally* fire any employee if it happened a second time.

102. Wanting to be helpful but also not wanting to publicly undermine BM, Plaintiff approached him after the meeting and informed him that forcing employees to pay for guest tabs is not legal. Further, Plaintiff stated that he may want to downplay his involvement with hiring and firing decisions, as it may disqualify himself from participating in the tip pool legally.

103. Despite this knowledge, BM was the one who fired Plaintiff himself just a few months later.

Defendants Failed to Pay Plaintiff the Applicable Minimum Wage for All Hours Worked

104. In addition to illegally including BM in the tip pool, Defendants failed to pay Plaintiff the minimum wage for all compensable hours worked, in violation of the FLSA, IMWL, Chicago Minimum Wage Ordinance, and IWPCA.

105. As a bartender, Plaintiff was an hourly, tipped employee.

106. As stated above, Plaintiff initially worked both Fridays and Saturdays, and her hours were eventually reduced to Saturdays only.

107. Her shift times varied, but they generally started between 7:00 and 9:00 PM, and ended approximately a half-hour after close—2:00 AM Sunday through Friday, and 3:00 AM on Saturdays.

108. Plaintiff was responsible for clocking herself in, but was not permitted to clock herself out. BM took the responsibility for clocking the bartenders out for the evening; however, BM was typically heavily inebriated by closing time, making it unlikely that his clock-outs were accurate.

109. For tipped employees, an employer may apply a tip credit, which permits them to pay those employees only 60% of the minimum wage, so long as the employer can demonstrate that the employee's tips made up the remaining 40% of the minimum wage and that the employer did not retain any of the tips. See 29 U.S.C. § 203(m)(2)(A); 820 ILCS 105/4(c); Municipal Code of Chicago, § 6-105-030.

110. The FLSA, IMWL, and Municipal Code of Chicago each proscribe recordkeeping obligations to employers. 29 U.S.C. § 211(c); 29 C.F.R. § 516.2; 820 ILCS 105/8; Municipal Code of Chicago, § 6-105-120.

111. Plaintiff's first shift was July 21, 2023, and her final shift was June 8, 2024.

112. In total, Plaintiff estimates that she worked approximately 80 shifts and 560 hours.

113. At the time of Plaintiff's employment, the applicable minimum wage for tipped employees in Chicago was $9.48 per hour. If the employee's wages after accounting for tips did not equal at least $15.80 per hour, the employer was required to make up the difference.

114. The Illinois minimum wage was slightly less than Chicago's: at the time of Plaintiff's employment, the applicable minimum wage for tipped employees in Illinois was $7.80 per hour. If the employee's wages after accounting for tips did not equal at least $13.00 per hour, the employer was required to make up the difference.

115. The Federal minimum wage was less than both Illinois and Chicago: at the time of Plaintiff's employment, the applicable federal minimum wage for tipped employees was $2.13 per hour. If the employee's wages after accounting for tips did not equal at least $7.25 per hour, the employer was required to make up the difference.

116. For the hours Plaintiff was paid, upon information and belief, she was correctly paid the Chicago minimum wage for tipped employees of $9.48 per hour; however, Plaintiff believes due to BM's intoxication, Defendants failed to pay her for all compensable hours worked.

117. In total, Plaintiff estimates that she is owed her hourly wage for a minimum of 80 hours of work.

<u>Defendants Made Illegal Deductions to Plaintiff's Wages in Violation of the IWPCA</u>

118. In May 2024, Defendants began unlawfully deducting 25% of bartenders' paychecks without providing any prior explanation or notice to employees.

119.     Upon information and belief, when asked, GM claimed these deductions were due to an alleged overpayment made in December 2023, approximately six (6) months prior.

120.     Under the IWPCA, 820 ILCS 115/9, and Illinois Administrative Code tit. 56, § 300.900, an employer may only recoup an overpayment: a) in full on the first payday following the overpayment, or b) through a mutually agreed-upon repayment schedule between the employer and the employee. Further, if no agreement is reached, the employer cannot unilaterally deduct wages without full compliance with Section 9 of the IWPCA.

121.     Defendants failed to meet these legal requirements, as they neither obtained Plaintiff's agreement to the repayment plan nor provided the required written notice before implementing the deductions.

122.     When Plaintiff attempted to contact HR on April 30, 2024 and May 3, 2024, in part to question the deductions, she discovered that HR had been terminated months earlier without notice to employees and with no alternative channel established.

Defendants Failed to Reimburse Plaintiff for Mandatory Uniforms

123.     The IWPCA provides that employers "shall reimburse an employee for all necessary expenditures or losses incurred by the employee within the employee's scope of employment and directly related to services performed for the employer." 820 ILCS 115/9.5.

124.     "Necessary expenditures" refers to "all reasonable expenditures or losses required of the employee in the discharge of employment duties and that inure to the primary benefit of the employer."

125.     GNJB Chicago is a 70s/disco-themed nightclub and Defendants required its bartenders to dress to the 70s theme.

126.     Throughout her employment, GM would regularly remind bartenders that they must adhere to the uniform requirements by posting on "Slack", the internal communication system used by Defendants.

127.     At the time of her hire, via email, Defendants offered to reimburse its bartenders for $100.00 worth of 70s apparel.

128.     Accordingly, Plaintiff purchased the necessary uniforms.

129.     Plaintiff submitted a request for reimbursement to GM via email within 30 days of purchase; however, Plaintiff never received a response.

130.     After sending the email and still within 30 days of purchase, Plaintiff later mentioned it to GM in person, but was still never reimbursed.

131.     Similarly, in October 2023, Defendants required employees to purchase a specific Halloween costume, and again, stated that they would be reimbursed for the purchase.

132.     Plaintiff complied, purchasing the uniform required of her.

133.     Plaintiff submitted a request for reimbursement to GM via Slack within 30 days of purchase; however, Plaintiff never received a response.

134.     She was never reimbursed for any uniforms she was required to purchase by Defendants.

**COUNT I**
**HARASSMENT ON THE BASIS OF SEX**
**IN VIOLATION OF TITLE VII**

135.     Paragraphs 1 through 134 are incorporated by reference as though fully restated herein.

136.     Plaintiff brings Count I under Title VII against Defendants for hostile work environment sexual harassment.

20

137.    Defendants are "employers" under 42 U.S.C. § 2000e(b) and Plaintiff was their employee under 42 U.S.C. § 2000e(f).

138.    Title VII's definition of "employer" includes the employer's "agent[s]," 42 U.S.C. § 2000e(b).

139.    The bar manager was Plaintiff's supervisor, and an agent of Defendants.

140.    The bar manager subjected Plaintiff to persistent unwelcome harassment on the basis of her sex in the form of inappropriate verbal and physical conduct, as described in ¶¶ 41; 53-56, 74-75, 77-78.

141.    The bar manager's harassment of Plaintiff was based on her sex.

142.    The bar manager's conduct substantially interfered with the performance of Plaintiff's work by creating a hostile and offensive working environment.

143.    Defendants failed to take any action to prevent supervisors from harassing employees, including, but not limited to:

- failing to conduct sexual harassment training;
- failing to promulgate any written policy regarding sexual harassment;
- failing to maintain an HR department or clear reporting mechanism for employee complaints;
- failing to follow their own progressive discipline policy which instructed the general manager to terminate any manager caught drinking for a second time;
- failing to enforce workplace rules equally; and
- failing to properly supervise management.

144.    As a direct result of the harassment that Defendants allowed, Plaintiff is entitled to damages including, but not limited to, compensation for lost past wages, future wages, past and future physical and emotional distress, punitive damages, attorney's fees and costs, pre-judgment interest, and equitable relief.

## COUNT II
## HARASSMENT ON THE BASIS OF SEX
## IN VIOLATION OF THE IHRA

145.    Paragraphs 1 through 144 are incorporated by reference as though fully restated herein.

146.    Plaintiff brings Count II under the IHRA against Defendants for hostile work environment sexual harassment.

147.    Defendants are "employers" under 775 ILCS 5/2-101(B) and Plaintiff was their employee under 775 ILCS 5/2-101(A).

148.    Under the IHRA, it is a civil rights violation for any employer, employee, or agent of any employer to engage in harassment on the basis of an employee's sex. 775 ILCS 5/2-102.

149.    The bar manager was Plaintiff's supervisor, and an agent of Defendants.

150.    The bar manager subjected Plaintiff to persistent unwelcome harassment on the basis of her sex in the form of inappropriate verbal and physical conduct, as described in ¶¶ 41; 53-56, 74-75, 77-78.

151.    The IHRA defines harassment as, in relevant part:

> (E-1) Harassment. "Harassment" means any unwelcome conduct on the basis of an individual's actual or perceived race, color, religion, national origin, ancestry, age, sex, marital status, order of protection status, disability, military status, sexual orientation, pregnancy, unfavorable discharge from military service, or citizenship status that has the purpose or effect of substantially interfering with the individual's work performance or creating an intimidating, hostile, or offensive working environment. For purposes of this definition, the phrase "working environment" is not limited to a physical location an employee is assigned to perform his or her duties. 775 ILCS 5/2-101.

152.    The bar manager's harassment of Plaintiff was based on her sex.

153.    The bar manager's conduct substantially interfered with the performance of Plaintiff's work by creating a hostile and offensive working environment.

154. Defendants failed to take any action to prevent supervisors from harassing employees, including, but not limited to:

- failing to conduct sexual harassment training;
- failing to promulgate any written policy regarding sexual harassment;
- failing to maintain an HR department or clear reporting mechanism for employee complaints;
- failing to follow their own progressive discipline policy which instructed the general manager to terminate any manager caught drinking for a second time;
- failing to enforce workplace rules equally; and
- failing to properly supervise management.

155. As a direct result of the harassment that Defendants allowed, Plaintiff is entitled to damages including, but not limited to, compensation for lost past wages, future wages, past and future physical and emotional distress, attorney's fees and costs, and pre-judgment interest.

## COUNT III
## DISCRIMINATION ON THE BASIS OF SEX
## IN VIOLATION OF TITLE VII

156. Paragraphs 1 through 155 are incorporated by reference as though fully restated herein.

157. Plaintiff brings Count III under Title VII against Defendants for sex-based discrimination.

158. Title VII prohibits employers from discriminating against employees based on sex, including through disparate treatment in employment decisions such as hiring, firing, job assignments, and wages. 42 U.S.C. § 2000e-2(a).

159. Defendants are "employers" under 42 U.S.C. § 2000e(b) and Plaintiff was their employee under 42 U.S.C. § 2000e(f).

160. Title VII's definition of "employer" includes the employer's "agent[s]," 42 U.S.C. § 2000e(b).

161. The general manager and bar manager were Plaintiff's supervisors, and agents of Defendants.

162. Defendants, through their agents, discriminated against Plaintiff on the basis of her sex, as described in ¶¶ 36-45, 50-62; 74-75, 77-83.

163. Defendants failed to take any action to prevent supervisors from discriminating against employees, including, but not limited to:

- failing to conduct sexual harassment training;
- failing to promulgate any written policy regarding workplace discrimination;
- failing to maintain an HR department or clear reporting mechanism for employee complaints;
- failing to follow their own progressive discipline policy which instructed the general manager to terminate any manager caught drinking for a second time;
- failing to enforce workplace rules equally; and
- failing to properly supervise management.

164. Plaintiff was treated less favorably than similarly situated male employees in the terms, conditions, and privileges of her employment.

165. Defendants' discriminatory conduct was willful and undertaken with reckless disregard for Plaintiff's rights under Title VII.

166. As a direct result of Defendants' unlawful discrimination, Plaintiff is entitled to damages including, but not limited to, compensation for lost past wages, future wages, past and future physical and emotional distress, punitive damages, attorney's fees and costs, pre-judgment interest, and equitable relief.

## COUNT IV
## DISCRIMINATION ON THE BASIS OF SEX
## IN VIOLATION OF THE IHRA

167. Paragraphs 1 through 166 are incorporated by reference as though fully restated herein.

168.    Plaintiff brings Count IV under the IHRA against Defendants for sex-based discrimination.

169.    Under the IHRA, it is a civil rights violation for any employer to discharge, discipline, or otherwise discriminate against an employee based on their sex. 775 ILCS 5/2-102(A).

170.    Defendants are "employers" under 775 ILCS 5/2-101(B) and Plaintiff was their employee under 775 ILCS 5/2-101(A).

171.    The general manager and bar manager were Plaintiff's supervisors, and agents of Defendants.

172.    Defendants, through their agents, discriminated against Plaintiff on the basis of her sex, as described in ¶¶ 36-45, 50-62; 74-75, 77-83.

173.    Defendants failed to take any action to prevent supervisors from discriminating against employees, including, but not limited to:

- failing to conduct sexual harassment training;
- failing to promulgate any written policy regarding workplace discrimination;
- failing to maintain an HR department or clear reporting mechanism for employee complaints;
- failing to follow their own progressive discipline policy which instructed the general manager to terminate any manager caught drinking for a second time;
- failing to enforce workplace rules equally; and
- failing to properly supervise management.

174.    Plaintiff was treated less favorably than similarly situated male employees in the terms, conditions, and privileges of her employment.

175.    Defendants' discriminatory conduct was willful and undertaken with reckless disregard for Plaintiff's rights under the IHRA.

176.    As a direct result of Defendants' unlawful discrimination, Plaintiff is entitled to damages including, but not limited to, compensation for lost past wages, future wages, past and future physical and emotional distress, attorney's fees and costs, pre-judgment interest.

**COUNT V**
**RETALIATION**
**IN VIOLATION OF TITLE VII**

177.     Paragraphs 1 through 176 are incorporated by reference as though fully restated herein.

178.     Plaintiff brings Count V under Title VII against Defendants for retaliation.

179.     Title VII prohibits employers from retaliating against an employee for opposing unlawful employment practices or participating in protected activity. 42 U.S.C. § 2000e-3(a).

180.     Defendants are "employers" under 42 U.S.C. § 2000e(b) and Plaintiff was their employee under 42 U.S.C. § 2000e(f).

181.     Title VII's definition of "employer" includes the employer's "agent[s]," 42 U.S.C. § 2000e(b).

182.     The bar manager and general manager were agents of Defendants.

183.     On May 25, 2024, Plaintiff engaged in protected activity by complaining about the unpermitted physical contact, i.e. telling the bar manager not to touch or throw things at her.

184.     Subsequent to Plaintiff's protected activity, Defendants, through the bar manager, took adverse action against her by terminating her from her employment after her next shift.

185.     Further, on July 11, 2024, Plaintiff engaged in further protected activity by filing her Charge of Discrimination with the EEOC and IDHR.

186.     Defendants, through the general manager, further retaliated against her by fabricating a write-up and adding it to her personnel file in an attempt to justify her illegal termination.

187.     Defendants adverse actions were causally connected to Plaintiff's protected activity.

188.     Defendants' actions were willful, intentional, and undertaken with reckless disregard for Plaintiff's rights under Title VII.

189.    As a direct result of Defendants' retaliation, Plaintiff is entitled to damages including, but not limited to, compensation for lost past wages, future wages, past and future physical and emotional distress, punitive damages, attorney's fees and costs, and pre-judgment interest.

## COUNT VI
## RETALIATION
## IN VIOLATION OF THE IHRA

190.    Paragraphs 1 through 189 are incorporated by reference as though fully restated herein.

191.    Plaintiff brings Count VI under the IHRA against Defendants for retaliation.

192.    Under the IHRA, it is a civil rights violation for an employer to retaliate against an employee for opposing unlawful discrimination or harassment or for engaging in other protected activity. 775 ILCS 5/6-101(A).

193.    Defendants are "employers" under 775 ILCS 5/2-101(B) and Plaintiff was their employee under 775 ILCS 5/2-101(A).

194.    The bar manager and general manager were agents of Defendants.

195.    On May 25, 2024, Plaintiff engaged in protected activity by complaining about the unpermitted physical contact, i.e. telling the bar manager not to touch or throw things at her.

196.    Subsequent to Plaintiff's protected activity, Defendants, through the bar manager, took adverse action against her by terminating her from her employment after her next shift.

197.    Further, on July 11, 2024, Plaintiff engaged in further protected activity by filing her Charge of Discrimination with the EEOC and IDHR.

198.    Defendants, through the general manager, further retaliated against her by fabricating a write-up and adding it to her personnel file in an attempt to justify her illegal termination.

199.    Defendants adverse actions were causally connected to Plaintiff's protected activity.

200. Defendants' actions were willful, intentional, and undertaken with reckless disregard for Plaintiff's rights under the IHRA.

201. As a direct result of Defendants' retaliation, Plaintiff is entitled to damages including, but not limited to, compensation for lost past wages, future wages, past and future physical and emotional distress, attorney's fees and costs, and pre-judgment interest.

## COUNT VII
## VIOLATION OF THE FLSA
## IMPROPER TIP POOL

202. Paragraphs 1 through 201 are incorporated by reference as though fully restated herein.

203. Plaintiff brings Count VII under the FLSA for Defendants' inclusion of a manager in the tip pool.

204. At all relevant times, Defendants were employers within the meaning of the FLSA, 29 U.S.C. § 203(d) and employed Plaintiff as a tipped employee.

205. Plaintiff regularly received tips from customers as part of her compensation and was subject to a tip pool arrangement implemented by Defendants.

206. As described in ¶¶ 93-100, Defendants unlawfully included a manager in the tip pool, in violation of 29 U.S.C. § 203(m)(2)(B), which explicitly prohibits employers, managers, or supervisors from retaining any portion of employees' tips.

207. As a result of Defendants' unlawful inclusion of a manager in the tip pool, Plaintiff's tips were improperly distributed and retained by an ineligible party—the bar manager—depriving Plaintiff of the full compensation to which she was entitled.

208. As described in ¶¶ 100-103, Defendants' actions were willful, unreasonable, and not in good faith, entitling Plaintiff to liquidated damages pursuant to 29 U.S.C. § 216(b).

209.     As a direct result of Defendants' violation of the FLSA, Plaintiff is entitled to statutory damages including compensation for lost wages, liquidated damages, and costs and attorneys' fees, as set forth under the FLSA. 29 U.S.C. § 216(b).

## COUNT VIII
## VIOLATION OF THE FLSA
## NONPAYMENT OF WAGES

210.     Paragraphs 1 through 209 are incorporated by reference as though fully restated herein.

211.     Plaintiff brings Count VIII under the FLSA for Defendants' failure to pay Plaintiff for all hours worked, thereby paying Plaintiff below the federal minimum wage.

212.     At all relevant times, Defendants were employers within the meaning of the Fair Labor Standards Act (FLSA), 29 U.S.C. § 203(d), and Plaintiff was an employee as defined by 29 U.S.C. § 203(e).

213.     The FLSA requires employers to compensate employees for all hours worked at a minimum wage of at least $7.25 per hour under 29 U.S.C. § 206(a). For tipped employees, the applicable federal minimum cash wage is $2.13 per hour. However, if an employee's tips combined with the cash wage do not equal at least $7.25 per hour, the employer is required to make up the difference to ensure the employee receives the full minimum wage.

214.     As described in ¶¶ 104-117, Defendants failed to pay Plaintiff for all hours worked, and as a result, failed to pay Plaintiff the required minimum wage for all hours worked in violation of the FLSA.

215.     Defendants' conduct was committed with reckless disregard for the law, entitling Plaintiff to liquidated damages pursuant to 29 U.S.C. § 216(b).

216.     Pursuant to the FLSA, employers such as Defendants are required to retain payroll records for at least three (3) years and records on wage computations, timecards, and work schedules for at least two (2) years. 29 U.S.C. § 211(c); 29 C.F.R. §§ 516.5(a), 516.6(a)(1).

217.     As a direct result of Defendants' violation of the FLSA, Plaintiff is entitled to statutory damages including compensation for lost wages, liquidated damages, and costs and attorneys' fees, as set forth under the FLSA. 29 U.S.C. § 216(b).

**COUNT IX**
**VIOLATION OF THE IMWL**
**NONPAYMENT OF WAGES**

218.     Paragraphs 1 through 217 are incorporated by reference as though fully restated herein.

219.     Plaintiff brings Count IX under the IMWL for Defendants' failure to pay Plaintiff for all hours worked, thereby paying Plaintiff below the Illinois minimum wage.

220.     At all times relevant, Defendants were Plaintiff's employers and Plaintiff was Defendants' employee, within the meaning of the IMWL. 820 ILCS 105/3(c), (d).

221.     Plaintiff was an employee engaged in an occupation in which receipt of gratuities were customary. 820 ILCS 105/4(c).

222.     Defendants, through their agents, violated the IMWL by failing to pay Plaintiff the minimum wage for all hours worked.

223.     During all times relevant, the IMWL required an employer to pay its covered, non-exempt employees the minimum wage of $13.00. 820 ILCS 105/4(a)(1).

224.     During all times relevant, the minimum wage for tipped employees in Illinois was $7.80 per hour. 820 ILCS 105/4(c).

225. As described in ¶¶ 104-117, Defendants failed to pay Plaintiff for all hours worked, and as a result, failed to pay Plaintiff the required minimum wage for all hours worked in violation of the IMWL.

226. Pursuant to the IMWL, employers such as Defendants are required to maintain payroll records for at least three (3) years. 820 ILCS 105/8.

227. As a direct result of Defendants' violation of the IMWL, Plaintiff is entitled to statutory damages, 5% monthly interest penalties, treble damages, and costs and attorneys' fees, as set forth under the IMWL. 820 ILCS 105/12(a).

**COUNT X**
**VIOLATION OF THE CHICAGO MINIMUM WAGE ORDINANCE**
**NON-PAYMENT OF WAGES**

228. Paragraphs 1 through 227 are incorporated by reference as though fully restated herein.

229. Plaintiff brings Count X under the Chicago Minimum Wage Ordinance for Defendants' failure to pay Plaintiff for all hours worked, thereby paying Plaintiff below the Chicago minimum wage.

230. Defendants were Plaintiff's employers and Plaintiff was Defendants' employee, within the meaning of the Chicago Minimum Wage Ordinance. Municipal Code of Chicago, § 6-105-010.

231. Plaintiff was an employee engaged in an occupation in which receipt of gratuities were customary. Municipal Code of Chicago, § 6-105-010.

232. Defendants, by its management and agents, violated the Chicago Minimum Wage Ordinance by failing to pay Plaintiff the minimum wage for all hours worked.

233. During all times relevant, the Chicago Minimum Wage Ordinance required an employer to pay its covered, non-exempt employees the minimum wage of $15.80 per hour. Municipal Code of Chicago, § 6-105-020.

234.    During all times relevant, the minimum wage for tipped employees in Chicago was $9.48 per hour. Municipal Code of Chicago, § 6-105-030.

235.    As described in ¶¶ 104-117, Defendants failed to pay Plaintiff for all hours worked, and as a result, failed to pay Plaintiff the required minimum wage for all hours worked in violation of the Chicago Minimum Wage Ordinance.

236.    Pursuant to the Chicago Minimum Wage Ordinance, employers such as Defendants are obligated to retain employee records for at least five (5) years. Municipal Code of Chicago, § 6-105-120.

237.    As a direct result of Defendants' violation of the Chicago Minimum Wage Ordinance, Plaintiff is entitled to treble damages, and costs and attorneys' fees as set forth under the Ordinance. Municipal Code of Chicago, § 6-105-110.

## COUNT XI
## VIOLATION OF THE IWPCA
## NON-PAYMENT OF WAGES

238.    Paragraphs 1 through 237 are incorporated by reference as though fully restated herein.

239.    Plaintiff brings Count XI under the IWPCA for Defendants' failure to pay her agreed to and earned wages for all hours worked.

240.    The IWPCA requires employers to pay their employees according to their agreements and to pay employees all earned wages or final compensation. 820 ILCS 115/2.

241.    Plaintiff was Defendants' employee and Defendants were Plaintiff's employers, as defined under the IWPCA. 820 ILCS 115/2.

242.    As set forth above, Defendants agreed to pay Plaintiff $9.48 per hour for all hours worked. However, if Plaintiff's tips did not equal $15.80 per hour, Defendants were required to make up the difference.

243.     As alleged above, Plaintiff was not paid for all hours worked.

244.     As a direct result of Defendants' violation of the IWPCA, Plaintiff is entitled to statutory damages, 5% interest penalties, and costs and attorneys' fees as set forth under the IWPCA. 820 ILCS 115/14(a).

## COUNT XII
## VIOLATION OF THE IWPCA
## UNLAWFUL DEDUCTIONS

245.     Paragraphs 1 through 244 are incorporated by reference as though fully restated herein.

246.     Plaintiff brings Count XII under the IWPCA for Defendants' unlawful deductions.

247.     The IWPCA requires employers to pay their employees according to their agreements and to pay employees all earned wages or final compensation. 820 ILCS 115/2.

248.     Plaintiff was Defendants' employee and Defendants were Plaintiff's employers, as defined under the IWPCA. 820 ILCS 115/2.

249.     Under the IWPCA, employers are prohibited from making deductions from an employee's wages unless the deduction is:

- Required by law (e.g., taxes, garnishments);
- To the benefit of the employee;
- In response to a valid wage assignment or wage deduction order; or
- made with the express written consent of the employee, given freely at the time the deduction is made.

   820 ILCS 115/9.

250.     As described in ¶¶ 118-122, Defendants unlawfully deducted 25% of Plaintiff's wages across several paychecks, without providing notice or obtaining Plaintiff's express written consent at the time of the deduction.

251.     Defendants' deductions were not for Plaintiff's benefit and were made in direct violation of 820 ILCS 115/9.

252.     As a direct result of Defendants' violation of the IWPCA, Plaintiff is entitled to statutory damages, 5% interest penalties, and costs and attorneys' fees as set forth under the IWPCA. 820 ILCS 115/14(a).

## COUNT XIII
## VIOLATION OF THE IWPCA
## FAILURE TO REIMBURSE NECESSARY EXPENSES

253.     Paragraphs 1 through 252 are incorporated by reference as though fully restated herein.

254.     Plaintiff brings Count XIII under the IWPCA for Defendants' failure to reimburse her for necessary expenses.

255.     The IWPCA requires employers to reimburse employees for all necessary expenditures or losses incurred within the scope of their employment and directly related to services performed for the employer. 820 ILCS 115/9.5.

256.     Plaintiff was Defendants' employee and Defendants were Plaintiff's employers, as defined under the IWPCA. 820 ILCS 115/2.

257.     Under the IWPCA, "necessary expenditures" are defined as all reasonable expenses required of an employee in the discharge of employment duties that primarily benefit the employer. 820 ILCS 115/9.5.

258.     As described in ¶¶ 123-134, Defendants failed to reimburse Plaintiff for her uniforms, which were purchased as a direct requirement of her employment and constituted a necessary expenditure under the IWPCA.

259.     Plaintiff submitted timely reimbursement requests to Defendants in compliance with the IWPCA, yet Defendants failed to provide reimbursement within 30 days, as required by law.

260.     Defendants' failure to reimburse Plaintiff for her uniforms resulted in financial harm, as Plaintiff was forced to bear out-of-pocket costs that should have been covered by Defendants.

261.    As a direct result of Defendants' violation of the IWPCA, Plaintiff is entitled to statutory damages including reimbursement of all unpaid expenditures, 5% interest penalties, and costs and attorneys' fees as set forth under the IWPCA. 820 ILCS 115/14(a).

WHEREFORE, Plaintiff, Alexis Pavlatos, respectfully requests that this Court enter judgment in her favor against Defendants, 905 West Randolph LLC, d/b/a Good Night John Boy and Forward Hospitality Group, LLC, awarding her:

a.    Damages for lost compensation under Title VII and the Illinois Human Rights Act;

b.    All damages to which she is entitled under the FLSA;

c.    All damages to which she is entitled under the IMWL;

d.    All damages to which she is entitled under the IWPCA;

e.    All damages to which she is entitled under the Chicago Minimum Wage Ordinance;

f.    Compensatory damages, including, but not limited to, pain and suffering and emotional distress under Title VII and the Illinois Human Rights Act;

g.    Punitive damages under Title VII;

h.    Plaintiff's costs and any attorneys' fees under all pled statutes;

i.    Such other and further relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Respectfully submitted,

*/s/ Alexis Pavlatos*
*Pro se*

Alexis Pavlatos (IARDC No. 6330270)
alexispavlatos@gmail.com
(224) 489-3422